U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 JUN 11  P 4: 34

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

COURTHOUSE NEWS SERVICE;                    )
VERMONT PRESS ASSOCIATION, INC.;            )
NEW ENGLAND FIRST AMENDMENT                 )
COALITION; GRAY MEDIA GROUP, INC.           )
d/b/a *WCAX-TV*; GANNETT VERMONT            )
PUBLISHING, INC. d/b/a *Burlington Free*    )
*Press*; SAMPLE NEWS GROUP, LLC d/b/a       )
*Barre-Montpelier Times Argus* and *Rutland* )
*Herald*; *VTDigger*, a project of the VERMONT )
JOURNALISM TRUST, LTD.; VERMONT             )
COMMUNITY NEWSPAPER GROUP, LLC              )
d/b/a *Stowe Reporter*, *News & Citizen*, *South* )
*Burlington Other Paper*, *Shelburne News*, and )
*The Citizen*; DA CAPO PUBLISHING, INC.,    )
d/b/a *Seven Days*,                         )
                                            )
        Plaintiffs,                         )
                                            )
    v.                                      )        Case No. 2:21-cv-000132
                                            )
PATRICIA GABEL, in her official capacity as )
the State Court Administrator of the Supreme )
Court of the State of Vermont; AMANDA       )
STITES, in her official capacity as Clerk of )
Court for Addison, Bennington, and Rutland  )
Counties; MARGARET VILLENEUVE, in          )
her official capacity as Clerk of Court for )
Caledonia, Essex, Orleans, and Washington   )
Counties; CHRISTINE BROCK, in her official  )
capacity as Clerk of Court for Chittenden   )
County; GAYE PAQUETTE, in her official      )
capacity as Clerk of Court for Franklin, Grand )
Isle, and Lamoille Counties; and ANNE       )
DAMONE, in her official capacity as Clerk of )
Court for Orange, Windham, and Windsor      )
Counties,                                   )
                                            )
        Defendants.                         )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**CNS'S MOTION FOR ATTORNEY'S FEES**
(Doc. 98)

On May 20, 2021, Plaintiffs Courthouse News Service ("CNS"); Vermont Press Association, Inc.; New England First Amendment Coalition; Gray Media Group, Inc. d/b/a WCAX-TV; Gannett Vermont Publishing, Inc. d/b/a Burlington Free Press; Sample News Group, LLC d/b/a Barre-Montpelier Times Argus and Rutland Herald; VTDigger, a project of the Vermont Journalism Trust, Ltd.; Vermont Community Newspaper Group, LLC d/b/a Stowe Reporter, News & Citizen, South Burlington Other Paper, Shelburne News, and The Citizen; and Da Capo Publishing, Inc. d/b/a Seven Days (collectively, "Plaintiffs") brought this action under 42 U.S.C. § 1983 against Defendants Patricia Gabel, in her official capacity as State Court Administrator of the Supreme Court of the State of Vermont; Amanda Stites, in her official capacity as Clerk of Court for Addison, Bennington, and Rutland Counties; Margaret Villeneuve, in her official capacity as Clerk of Court for Caledonia, Essex, Orleans, and Washington Counties; Christine Brock, in her official capacity as Clerk of Court for Chittenden County; Gaye Paquette, in her official capacity as Clerk of Court for Franklin, Grand Isle, and Lamoille Counties; and Anne Damone, in her official capacity as Clerk of Court for Orange, Windham, and Windsor Counties (collectively, "Defendants").

Plaintiffs sought a declaratory judgment that Defendants' policies and practices in delaying access to newly filed civil complaints violated the First Amendment of the Constitution and a preliminary and permanent injunction prohibiting Defendants from continuing those policies and practices. On September 5, 2025, the court entered judgment for Plaintiffs, issuing a declaratory judgment and granting a permanent injunction. (Doc. 95.) On October 17, 2025, CNS moved for attorney's fees and costs. (Doc. 98.) On November 18, 2025, Defendants opposed the motion, (Doc. 99), and CNS replied on December 9, 2025. (Doc. 100.)

Plaintiffs are represented by Jonathan G. Fetterly, Esq., Jonathan E. Ginsberg, Esq., Matthew B. Byrne, Esq., Robert B. Hemley, Esq., and William Hibsher, Esq.

2

Defendants are represented by David A. Boyd, Esq., David R. Cassetty, Esq., David R. Groff, Esq., and Debbie H. Stevens, Esq.

## I.    Factual and Procedural Background.

On June 7, 2021, Plaintiffs filed a First Amended Complaint ("FAC") which asserted one claim against Defendants, alleging that Defendants violated the First Amendment under 42 U.S.C. § 1983 because "their policies and practices of withholding newly filed civil complaints from press and public view until after administrative processing, and their corresponding application of Vermont Rule for Public Access to Court Records [('V.R.P.A.C.R.')] § 7(a)(3), that result in the denial of contemporaneous access to new civil complaints upon receipt for filing, deprive Plaintiffs, and by extension their subscribers, readers, members, and the public, of the right of access to judicial records secured by the First Amendment[.]" (Doc. 16 at 19, ¶ 68.) Plaintiffs alleged that "[t]here is no compelling or overriding interest sufficient to justify Defendants' unconstitutional actions resulting in the denial of contemporaneous access to newly filed civil complaints under the First Amendment" and that "[e]ven if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest." *Id.* at 20, ¶ 69.

In their prayer for relief, Plaintiffs requested a declaratory judgment "declaring Defendants' policies and practices that knowingly effect delays in access to newly filed civil complaints, including[,] without limitation, their policy and practice of denying access to complaints until after administrative processing, as unconstitutional under the First and Fourteenth Amendments . . . , for the reason that these policies and practices constitute an effective denial of contemporaneous access to public court records[.]" *Id.* at 20. Plaintiffs also sought a preliminary and permanent injunction "declaring Defendants' application of [V.R.P.A.C.R.] § 7(a)(3) in a manner that knowingly denies access to newly filed civil complaints until after administrative processing as unconstitutional under the First and Fourteenth Amendments . . . , for the reason that the manner in which the Rule is applied constitutes an effective denial of contemporaneous access to public court records[,]" "prohibiting [Defendants] from continuing their policies and practices

3

that deny Plaintiffs contemporaneous access to newly filed civil complaints, including, without limitation, their policy and practice of denying access to complaints until after administrative processing, and requiring Defendants to provide contemporaneous access to newly filed civil complaints[,]" and "prohibiting [Defendants] from applying [V.R.P.A.C.R.] § 7(a)(3) in a manner that denies Plaintiffs access to newly filed civil complaints until after administrative processing, and requiring Defendants to provide contemporaneous access to newly filed civil complaints[.]" *Id.* at 21-22.

The discovery in this case was extensive. Plaintiffs examined the court records from every county in Vermont to capture delays in public access. Defendants, in turn, sought and obtained the date of CNS's first publication of every new civil complaint that it covered nationwide in May and June during a ten-year period in an effort to establish that Vermont provided more timely access than most states. This involved electronic data for over 1.4 million cases. Defendants further demanded and received evidence regarding the frequency at which CNS visited over 3,000 courts during a ten-year period. Both Plaintiffs and Defendants retained expert witnesses to analyze the voluminous data produced.

On July 12, 2021, Plaintiffs filed a motion for a preliminary injunction, and Defendants filed a motion to dismiss on August 18, 2021. Pursuant to Fed. R. Civ. P. 65(a)(2), with the parties' consent, the court consolidated the hearing on the motions with a trial on the merits. The consolidated hearing and trial were held on October 25, 2021. The parties stipulated to a trial without live witnesses, asking the court to make its factual findings based on the evidence they submitted.

The court analyzed Vermont's pre-access review process which released to the public 4,156 complaints filed in the Superior Court during approximately sixteen months between the Vermont trial court's transition to electronic filing and August 6, 2021 (the last day for which data was produced prior to trial) (the "Trial Evidence Period"). The court found that the delays during the Trial Evidence Period were as follows: 54.8% of complaints were made available to the public on the day of filing, 22.6% were made available on the day after filing, 4.6% were made available two days after filing, 6.7%

were made available three days after filing, and 11.4% were made available four or more days after filing.

The court found that delays during the Trial Evidence Period were longer in certain county units of the Superior Court than others. For example, the percentage of newly filed civil complaints made available on the day they were filed ranged from 3.8% in Essex County to 81.6% in Windham County. Delays fluctuated, and in some weeks, no newly filed civil complaints were made available the day they were filed, while in one week, 91.7% were made available the same day as filing.

On November 19, 2021, the court entered an Opinion and Order, denying as moot Plaintiffs' motion for a preliminary injunction, denying Defendants' motion to dismiss, granting in part and denying in part Plaintiffs' request for permanent injunctive relief, and denying Plaintiffs' request for declaratory relief (the "November 19, 2021 Opinion and Order"). The court denied Plaintiffs' motion for preliminary injunction as moot because a trial on the merits had been held. The court denied Defendants' motion to dismiss because "Plaintiffs have identified a First Amendment right to access to newly filed complaints[.]" (Doc. 62 at 17.) Although Defendants argued "the [FAC] is partially moot and will soon be completely moot because the Vermont Superior Courts are centralizing their review process for civil filings which will expedite review[,]" the court found that "[b]ecause Defendants have not voluntarily ceased the pre-access review process which Plaintiffs challenge, Plaintiffs' First Amendment claim is not moot." *Id.* at 18-19. The court further found that abstention was not warranted.

With respect to Plaintiffs' request for a permanent injunction, the court found that Plaintiffs had a First Amendment right to access newly filed complaints and, therefore, Defendants' delay in releasing them could only be found constitutional if their "interest in the protection of the privacy of litigants and third[]parties in confidential information[]" was "narrowly tailored and 'essential to preserve higher values.'" *Id.* at 26 (alteration adopted) (citation omitted). The court held that Defendants' pre-access review was not essential to preserve higher values of protecting privacy and confidential information because "out of 4,156 electronically filed civil complaints, only three

5

exhibits to two complaints were rejected during the pre-access review process because they contained confidential information[]" and "Defendants cite no evidence that they experienced significant confidentiality breaches prior to the implementation of pre-access review, nor do they cite any court in the country that has found a similar process necessary." *Id.* at 27. The court further found that Defendants' pre-access review was not narrowly tailored to achieve those interests because Defendants placed the onus on the filers of complaints to indicate that the complaint contains confidential information, and "Defendants provide[d] no evidence that these safeguards, combined with post-access review, are insufficient. To the contrary, Defendants' own evidence reveals that placing the onus on filers has been overwhelmingly effective." *Id.* at 28.

Based upon its findings of fact, the court granted in part Plaintiffs' request for a permanent injunction, enjoining Defendants "from prohibiting public access to newly filed civil complaints which have not been designated confidential by the filer until the Vermont Superior Court has completed a pre-access review process." *Id.* at 31. The court noted that "Defendants may continue to restrict public access post-filing where a potential violation of their filing rules has been found." (Doc. 62 at 31.) The court denied in part Plaintiffs' request for a permanent injunction because their "request for an injunction prohibiting enforcement of all 'policies and practices that deny Plaintiffs contemporaneous access to newly filed civil complaints' and 'prohibiting Defendants from applying V.R.P.A.C.R. 7(a)(3)' is overbroad[]" and "[a]n injunction addressing only the specifically challenged pre-access review process and leaving internal procedures to the Vermont Superior Courts is more appropriate." *Id.* (alterations adopted). The court denied Plaintiffs' request for declaratory relief because it "would serve no purpose which the court's permanent injunction has not achieved." *Id.*

On December 17, 2021, Defendants appealed the court's judgment in favor of Plaintiffs. *See Courthouse News Serv. v. Corsones*, 131 F.4th 59 (2d Cir. 2025). On appeal, the Second Circuit found "no error in the district court's determination that, with respect to the [Trial Evidence Period], the First Amendment gave Plaintiffs a right of access to complaints newly filed in the Superior Court and that the Defendants' pre-

6

access review process in that period violated that right." *Id.* at 67. It "reject[ed] both arguments" of Defendants, *id.* at 76, and agreed that neither abstention doctrines nor mootness barred the court's review. The Second Circuit vacated the injunction, which it interpreted as "essentially requir[ing] the instantaneous release of new civil complaints without permitting any delay whatsoever for pre-access review, no matter how rapid, efficient, and well justified by its objectives it may be." *Id.* at 74.

In vacating the injunction, the Second Circuit reasoned, "[t]he fact that the Superior Court's processes reviewed by the court at trial were properly found to violate the First Amendment does not support a conclusion that the Superior Court would be incapable of developing pre-access review processes that would be consistent with the requirements of the Constitution[]" because "the Superior Court may well develop new, well-tailored, pre-access screening processes that will provide sufficiently speedy access so as to be in compliance with the First Amendment's demands." *Id.* at 76. With respect to the court's denial of declaratory judgment, the Second Circuit instructed, "[a]s the injunction granted by the district court is now vacated by reason of its overbreadth, the district court might now wish to consider entering a declaratory judgment while contemplating the parties' submissions addressed to the terms of the new injunction." *Id.* at 79. On April 25, 2025, the Second Circuit granted Plaintiffs' motion for an order declaring that it was entitled to an award of attorney's fees and referred the issue to this court "to determine a reasonable amount." *Corsones*, Docket No. 21-3098 at Doc. 167 at 1.

On remand, after granting the parties' request to stay the proceedings while they attempted to resolve any remaining issues, the court decided no further extensions were warranted. Defendants, at that point, sought a judgment that their new system of pre-access review was constitutional. Plaintiffs opposed this effort, arguing that Defendants' proposed amended judgment would re-write the history of this case and flout the Second Circuit's First Amendment violation determination. The court agreed, reasoning that Defendants could not prolong a case, which Plaintiffs no longer chose to pursue, by seeking a redetermination of the issues based on new evidence of a new system which

was contemplated but not yet in existence. In accordance with the Second Circuit's mandate, on September 5, 2025, the court entered a declaratory judgment and issued a permanent injunction as follows:

1.  Plaintiffs have a presumptive First Amendment right of access to newly filed complaints, which attaches upon a court's receipt of such complaints.

2.  This presumptive right of timely access attaches on receipt regardless of whether courts use paper filing or e-filing systems.

3.  The pre-access review process followed by the Vermont Superior Courts during the Trial Evidence Period violated Plaintiffs' First Amendment right of access to newly filed complaints for the reasons stated by the Second Circuit in its Opinion dated March 11, 2025.

4.  It is further ORDERED, ADJUDGED, and DECREED that Defendants are hereby permanently enjoined from continuing to employ the pre-access review process followed by the Vermont Superior Courts during the Trial Evidence Period.

(Doc. 95 at 3-4.)

CNS seeks a total of $2,145,451.98 in attorney's fees and costs and expenses for the district court proceedings prior to appeal, the Second Circuit appeal, and post-appeal district court proceedings.[1] CNS breaks down its request as follows:

| | |
|---|---|
| District Court Fees (non-fee motions) | $1,108,456.50 |
| Second Circuit / Appellate Fees | $703,637.00 |
| Expenses / Costs | $59,145.58 |
| Motions for Attorney's fees (District Court and Second Circuit) | $274,212.90[2] |

## II.    Conclusions of Law and Analysis.

### A.    Attorney's Fees.

Of the requested amount, CNS identifies $2,086,306.40 as attorney's fees. Under 42 U.S.C. § 1988, courts may "award a reasonable attorney's fee to prevailing parties in

---

[1] Only CNS requests attorney's fees because it "paid Plaintiffs' attorney['s] fees and expenses incurred in this matter[.]" (Doc. 98-1 at 5 n.1.)

[2] This is the sum of the amount CNS noted its motion for attorney's fees, $168,169.50, and the amounts CNS additionally requested in connection with its instant motion and reply, $106,043.40.

civil rights litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). "[A] party prevails when it 'succeeds on any significant claim affording it some of the relief sought[.]'" *Lackey v. Stinnie*, 604 U.S. 192, 206 (2025) (alteration adopted) (citation omitted).

Defendants do not dispute that CNS is a prevailing party and is entitled to a reasonable amount of attorney's fees, and the Second Circuit has so ruled. Defendants do, however, contest virtually every other aspect of the requested fee award. Defendants argue that "the Judiciary accomplished its primary goal and CNS did not[]" and that this case "had no systemic effect of importance and served no larger public interest[.]" (Doc. 99 at 4-5) (internal quotation marks and citation omitted). They further claim:

> CNS has failed to establish for purposes of the lodestar analysis that its counsel reasonably spent 2,722.9 hours briefing and arguing cross-motions at the trial court level, conducting limited written discovery, and briefing and arguing an appeal. Nor could it. CNS seeks nearly eight times the amount a court found reasonable for trial court work in a recent similar CNS case and between four and five times as many appellate hours as courts have found reasonable for litigating constitutional issues at a high level. CNS did not need [eleven] lawyers and [thirteen] timekeepers to pursue a case defended almost entirely by one Assistant Attorney General carrying a full caseload of other cases. And it certainly did not need to have new lawyers continually learn this case by having one lawyer do most of the trial court work, a second write its appeal brief, and yet another argue the appeal.
>
> . . . CNS has failed to overcome the presumption that any fees should be awarded at Vermont rates. Large firms handling cases like this regularly leverage any specialized expertise they may have by choosing well-qualified local counsel, giving them templates, and then editing their work as needed. Indeed, CNS's counsel recently did just that in a similar Ohio case, in which they requested 43.2 hours of national and 634.8 hours of local counsel time, figures starkly different than the 2624.9 hours of national and 98 hours of local counsel time requested here. *See [Courthouse News Serv.] v. O'Shaughnessy*, . . . 2023 WL 7626992, *2 (S.D. Ohio Nov. 15, 2023)[.] CNS has failed to establish that the experienced local counsel it selected could not have done the work here in a fraction of the time at a fraction of the cost. And CNS has failed to establish that the lawyers who did most of the work in this case even had specialized experience.

*Id.* at 2-3.

"[A] prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust[,]" but "[t]he amount of the fee . . . must be determined on the facts of each case." *Hensley*, 461 U.S. at 429 (internal quotation marks and citations omitted). The court has "discretion to determine [] what constitutes a reasonable fee." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted) (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 758 (2d Cir. 1998)). "[W]hen a prevailing party is entitled to attorney['s] fees, the [] court 'must abide by the procedural requirements for calculating those fees articulated by [the Second Circuit] and the Supreme Court.'" *Id.*

A court begins its analysis by calculating a "presumptively reasonable fee" based on a reasonable hourly rate and a reasonable number of hours required by the case. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183-84 (2d Cir. 2008). "[T]he fee applicant bears the burden of establishing entitlement to an award[.]" *Hensley*, 461 U.S. at 437. The presumption of reasonableness is "strong[,]" and the presumptively reasonable fee may only be adjusted in "rare and exceptional circumstances." *Perdue*, 559 U.S. at 552-53 (internal quotation marks and citations omitted).

### 1. Reasonable Hourly Rate.

"The reasonable hourly rate is the rate a paying client would be willing to pay[,] bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190; *see also Perdue*, 559 U.S. at 552 ("[A] 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious . . . case."). In determining the hourly rate a reasonable client would be willing to pay, the court must consider case-specific variables, including:

> [T]he complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest

10

(independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

*Arbor Hill*, 522 F.3d at 184 (footnote omitted). Other relevant case-specific variables include the *Johnson* factors:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3 (citing *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), *abrogated by Blanchard v. Bergeron*, 489 U.S. 87 (1989)). As the Second Circuit has observed, "attorney's fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 266 (2d Cir. 2014) (internal quotation marks and citation omitted).

### a.    Degree of Success Obtained.

In determining a reasonable fee, "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436. In analyzing this factor, the court "is not limited to inquiring whether a plaintiff prevailed on individual claims[]" but rather must consider "the [overall] quantity and quality of relief obtained[.]" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Carroll v. Blinken*, 105 F.3d 79, 81 (2d Cir. 1997)). "Where the damage award is nominal or modest, the injunctive relief has no systemic effect of importance, and no substantial public interest is served, a substantial fee award cannot be justified." *Carroll*, 105 F.3d at 81.

11

CNS argues that it should receive an award of all attorney's fees it incurred because Plaintiffs "were entirely successful" on their only claim, violation of the First Amendment, and obtained their requested declaratory judgment and permanent injunction. (Doc. 98-1 at 13.) It further asserts that, "[b]y prompting a change in 'institutional practices' and deterring unconstitutional conduct, Plaintiffs' suit achieved an excellent result of 'significant import' because their success conferred a benefit on the public." *Id.* Plaintiffs concede they did not obtain judgment on their broader claim that pre-access review is prohibited under any circumstance because the Second Circuit opined that Defendants "may well develop new, well-tailored, pre-access screening processes that will provide sufficiently speedy access so as to be in compliance with the First Amendment's demands." *Corsones*, 131 F.4th at 76.

Both this court and the Second Circuit found that "[t]he pre-access review process followed by the Vermont Superior Courts during the Trial Evidence Period violated Plaintiffs' First Amendment right of access to newly filed complaints[.]" (Doc. 95 at 3-4); *see also Corsones*, 131 F.4th at 76 ("[Defendants] processes reviewed by the court at trial were properly found to violate the First Amendment[.]"). The Second Circuit did not approve of Defendants' pre-access review process, nor did it find any delay occasioned was minimal or trivial. Defendants' arguments to the contrary, and their suggestion that no important or systemic change were achieved, is unsupported by the record.

While the Second Circuit acknowledged that Defendants' future review processes might not violate Plaintiffs' First Amendment right of access, it did not immunize those procedures from a potential First Amendment challenge. Indeed, the majority of the Second Circuit panel specifically rejected the concurrence's suggestion that the Vermont Judiciary be permitted to experiment with its review process in the face of a First Amendment violation. Moreover, there was no evidence that Defendants were on the brink of jettisoning their centralized pre-access review process when this action was brought, nor did they do so during the many months this action was pending.[3]

---

[3] In its November 19, 2021 Opinion and Order, the court found that Defendants were still utilizing their decentralized review process. *See* Doc. 62 at 19. The Second Circuit noted that, at

12

On balance, an award of mere nominal attorney's fees, as Defendants request, is improper because Plaintiffs achieved systemic changes of great importance which advance a significant public interest in prompt access to newly filed complaints. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 327 (4th Cir. 2021) ("Because they allow the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought, access to complaints, like access to docket sheets, is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.'") (quoting *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014)). An award of fully compensatory attorney's fees, however, is not warranted because Plaintiffs did not entirely achieve their litigation objectives as set forth in the FAC. The court finds that a 40% across-the-board reduction of the presumptively reasonable fee is appropriate to reflect the fact that Plaintiffs did not achieve complete success. *See Courthouse News Serv. v. Planet*, 2022 WL 2062467, at *2-4 (C.D. Cal. Jan. 24, 2022) (applying a "40% across-the-board reduction to the lodestar amount . . . to account for CNS's partial success, in that while it did secure a right to timely access to civil complaints, it did not succeed in securing a right to same-day access[]" and noting that the ultimate outcome "altered little in the real-world relationship between the parties in this case[]") (emphasis omitted).

### b.    Out-of-District Rates.

"[T]he district court's assessment of the reasonableness of a prevailing party's decision to retain out-of-district counsel is best considered in setting the hourly rate—rather than in deciding whether to adjust a presumptively reasonable fee[.]" *Arbor Hill*, 522 F.3d at 191. "[W]hen faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule[,]" under which attorney's fees are calculated based on the district in which the litigation was brought. *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009). However,

the time of appeal, Defendants conversion to a centralized pre-access review process "was only partially accomplished (with substantial further centralization still to be achieved)[.]" *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 72 (2d Cir. 2025).

13

"where circumstances have warranted it, [the Second Circuit] ha[s] not insisted on strict adherence to the forum rule." *Arbor Hill*, 522 F.3d at 192 (citation omitted).

To overcome the presumption of the forum rule, "a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 547 (2d Cir. 2023) (quoting *Simmons*, 575 F.3d at 175). "In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors[,]" including "counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise." *Simmons*, 575 F.3d at 175.

> If a high[-]priced, out[-]of[-]town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge . . . may allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally.

*Id.* at 176 (alteration adopted) (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982)).

"The party seeking the award must make a particularized showing[] not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result." *Id.* "Among the ways an applicant may make such a showing is by establishing that local counsel possessing requisite experience were unwilling or unable to take the case, or by establishing, in a case requiring special expertise, that no in-district counsel possessed such expertise." *Id.* (internal citation omitted). Absent such a showing, the court presumes that a reasonable client would "in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally." *Arbor Hill*, 522 F.3d at 191.

14

In *Courthouse News Service v. Schaefer*, 484 F. Supp. 3d 273 (E.D. Va. 2020), a CNS case factually similar to this one, the court considered out-of-district rates to determine the reasonable hourly rate, reasoning:

> This case involved a sophisticated constitutional issue of first impression in this circuit that involved detailed statistical analysis. In fact, the data was of such a complex nature that the [c]ourt found it necessary to conduct its own *de novo* review of the submitted filing data.

> \*\*\*

> The issues presented in this case go beyond basic issues of First Amendment law. It is entirely reasonable that Plaintiff should be entitled to recover fees for the use of lawyers that have familiarity with both the Plaintiff's media practices and the complex intricacies that are involved in these right of access for the press cases.

*Id.* at 278-79.

Here, the case involved the same "sophisticated constitutional issue of first impression" in the Second Circuit regarding the First Amendment right to access newly filed complaints. *Id.* at 278. CNS has used the out-of-district law firm Bryan Cave Leighton Paisner, LLP ("BCLP") for almost twenty years to litigate its First Amendment right to access cases, including in *Schaefer*. As CNS points out, "[o]ver this time, BCLP attorneys have developed unique and specialized experience with the different ways state and federal courts provide access to new e-filed civil complaints . . . , [CNS's] unique reporting practices, and the importance of protecting the right of the press and public to know about civil litigation in a timely fashion, while the news is still fresh." (Doc. 98-1 at 14) (citations omitted).

Given the complex nature of the claim and BCLP's special expertise in litigating First Amendment right to access cases for CNS, a reasonable client would have selected BCLP to litigate this case because doing so would likely produce a substantially better outcome. *See IMS Health Inc. v. Sorrell*, 2012 WL 2915845, at \*3 (D. Vt. July 17, 2012) (finding the "presumption in favor of the forum rule is overcome in this case[]" because of "counsel's expertise in litigating this case—particularly because they had just successfully litigated the same issues in New Hampshire and were also representing

[p]laintiffs in similar litigation in Maine[]"); *Horror Inc. v. Miller*, 2022 WL 4473426, at *5 n.3 (D. Conn. Sept. 26, 2022) (concluding that the defendant rebutted the presumption of the forum rule because his counsel "has experience litigating termination rights cases, a rare copyright subspecialty" and "has successfully litigated such cases before" and therefore, the defendant's "favorable outcome reflects the quality of his counsel's performance, suggesting that out-of-district counsel was likely to produce a substantially better result[]").

Defendants argue that "CNS has failed to establish that the attorneys it used to do most of the work here actually had specialized knowledge[,]" (Doc. 99 at 15); however, nearly all the BCLP attorneys working on this case, including William Hibsher, Rachel Matteo-Boehm, Roger Myers, Jonathan Fetterly, and Katherine Keating, had prior experience in CNS litigation involving the First Amendment. Although CNS conceded that "'[m]ost of the initial drafting' of trial court materials was by two 'BCLP associates[,]'" *id.*, CNS claims that one of those associates, Jonathan Ginsberg, had prior experience in CNS litigation "including filing and handling the [*Courthouse News Service v.*] *Tingling*[, Case No. 1:16-cv-8742 (S.D.N.Y. Nov. 10, 2016)] and *Schaefer* cases." (Doc. 98-2 at 5, ¶ 8.) Moreover, even if initial drafting were performed by less experienced associates, this is a typical, cost-savings mechanism, which generally decreases the costs of litigation. *See, e.g., Kizer v. Abercrombie & Fitch Co.*, 2017 WL 9512408, at *11 (E.D.N.Y. July 24, 2017) ("The ratio of associate to partner hours on pretrial work typically reflects more associate than partner hours—often significantly more.") (internal quotation marks and citation omitted), *report and recommendation adopted*, 2017 WL 3411952 (E.D.N.Y. Aug. 9, 2017).

For the foregoing reasons, the court finds that CNS has rebutted the presumption of the forum rule.

### c.    The Rates Charged.

With the presumption of the forum rule rebutted, "a district court may use an out-of-district hourly rate—or some rate in between the out-of-district rate sought and the rates charged by local attorneys—in calculating the presumptively reasonable fee[.]"

16

*Arbor Hill*, 522 F.3d at 191. As the Second Circuit has observed, "there is good reason for a district court not to be wed to the rates in its own community. If they are lower than those in another district, skilled lawyers from such other district will be dissuaded from taking meritorious cases in the district with lower rates." *A.R. ex rel. R.V. v. N.Y.C. Dep't of Educ.*, 407 F.3d 65, 81 (2d Cir. 2005).

While the hourly rate that an attorney charges to paying clients may be evidence of a reasonable hourly rate, it is not dispositive. *See Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001) ("[T]he actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'"). In determining what is a reasonable hourly rate, a district court judge may "rely in part on the judge's own knowledge of private firm hourly rates in the community[.]" *Miele v. New York State Teamsters Conf. Pension & Ret. Fund*, 831 F.2d 407, 409 (2d Cir. 1987).

CNS seeks attorney's fees for the work of seven BCLP senior attorneys with hourly rates ranging from $676 to $927.27, one associate with hourly rates ranging from $441 to $518.28, and two paralegals with hourly rates ranging from $342 to $412. It also seeks attorney's fees in connection with the in-district work of two local senior attorneys at Gravel & Shea ("G&S") with hourly rates ranging from $510 to $570. The breakdown of each timekeeper's hourly rates is as follows:

17

| Timekeeper | Position | Law Firm | Hourly Rate |
|---|---|---|---|
| William Hibsher | Senior Counsel | BCLP | $837 in 2021 and $905 in 2022 |
| Jonathan Ginsberg | Partner | BCLP | $707 in 2021 through January 2022, $765 beginning in February 2022, and $824 in 2023 |
| Roger Myers | Partner | BCLP | $743 in 2021 through January 2022, $816 beginning in February 2022, and $816 to $864 in 2023 through 2025 |
| Rachel Matteo-Boehm | Partner | BCLP | $676 in 2021, $707 in January 2022, $732 beginning in February 2022, and $786 in 2023 through 2025 |
| Jonathan Fetterly | Partner | BCLP | $778 |
| Glenn Coleman | Counsel | BCLP | $878 in 2022[4] and $927 in 2023 through 2025 |
| Katherine Keating | Partner | BCLP | $666 in 2021 and $731 in 2023 through 2025 |
| Michael Neville | Associate | BCLP | $441 in 2021 through January 2022 and $518 beginning in February 2022 |
| Eileen Weiss | Paralegal | BCLP | $356 in 2021 through January 2022, $392 beginning in February 2022, and $412 in 2023 through 2025 |
| Diana Myers | Paralegal | BCLP | $342 |
| Robert Hemley | Of Counsel | G&S | $510 in 2021 and $570 in 2025 |
| Matthew Byrne | Shareholder | G&S | $525 |

While hourly rates generally increase over time, the requested hourly rates for BCLP attorneys and paralegals and G&S attorneys are significantly higher than the hourly rates this court generally approves.[5] *Chaney v. Vermont Bread Co.*, 2024 WL

---

[4] CNS claims that "[Glenn] Coleman's hourly rate for this matter in 2022 was $441[,]" (Doc. 98-2 at 12, ¶ 26), but the billing entries indicate his hourly rate was $878. *See, e.g.*, Doc. 98-3 at 18.

[5] *See, e.g.*, *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 2025 WL 3295806, at *12 (D. Vt. Nov. 26, 2025) ("[A]ttorney hourly rates of over $350 and paralegal hourly rates of over $90 are not reasonable in this case."); *Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2021 WL 1851404, at *2-3 (D. Vt. May 10, 2021) (finding hourly rates of $300-350 for senior attorneys, $225-50 for associate attorneys, and $90-110 for paralegals to be reasonable in-district hourly rates and finding hourly rates of $400 for senior attorneys, $250 for associate attorneys, and $125 for paralegals to be reasonable out-of-district hourly rates); *Allen v. Dairy Farmers of Am., Inc.*,

1270788 (D. Vt. Mar. 26, 2024) is instructive. There, this court reduced the requested out-of-district hourly rates, explaining:

> The instant case, a class action requiring specialized knowledge of the [Worker Adjustment and Retraining Notification ("WARN")] Act, is uniquely complex. Attorneys from The Gardner Firm report that they are particularly qualified to bring such a case. Attorney Olsen, acting as lead counsel for the Class, attests that she has served as class counsel in nearly 100 WARN Act class actions nationwide. The two other attorneys from her firm specialize in labor and employment law.

> Notwithstanding these qualifications, the $550 per hour rate sought by The Gardner Firm attorneys is higher than the rates typically approved by this [c]ourt. It is also higher than the fees generally charged by attorneys in this [d]istrict. In 2021, the court approved a $400 per hour rate for out-of-state counsel with specific and relevant expertise. *See Sullivan* [*v. Saint-Gobain Performance Plastics Corp.*], 2021 WL 1851404, at *3 [(D. Vt. May 10, 2021)]. Three years have passed since the *Sullivan* decision, and the [c]ourt is aware that rates generally increase over time. The [c]ourt therefore finds that, given The Gardner Firm's experience with both class actions and the WARN Act, $450 per hour is a reasonable rate for its attorneys.

> Attorney Stuart Miller attests that he has served as class counsel in over 100 WARN Act cases. His hourly fee of $925 per hour, however, is significantly above fees allowed in this [d]istrict even for complex cases. The [c]ourt therefore finds that, like The Gardner Firm attorneys, Stuart Miller's fee must be reduced to $450 per hour. Johnathan Miller's hourly fee is correspondingly reduced to $225 per hour.

*Id.* at *3 (some internal citations omitted). With respect to the dissolution receiver's counsel in *Chaney*, the attorneys provided a discounted hourly rate of $600 when their standard hourly rates were $1,885 and $1,350, and the court approved the $600 hourly rate as reasonable in light of "the experience of the . . . attorneys, their agreement with their client, the significant discount from their usual fees, and Vermont's interest in retaining access to experienced out-of-state counsel[.]" *Id.*

---

2016 WL 3361544, at *5 n.7 (D. Vt. June 14, 2016) (finding "out-of-district hourly rates apply in this instance" but "some rates claimed by Lead Counsel are excessive[]" because "[t]en Lead Counsel attorneys billed the class more than $700 per hour, fourteen current and former paralegals charged between $220 and $279 per hour, and legal assistants charged as much as $300 per hour[]").

19

The litigation involved a First Amendment right to access claim that was an issue of first impression in the Second Circuit, the issues presented, which included mootness and abstention, were complex, and the matter required specialized knowledge. The hourly rates of BCLP senior attorneys ranging from $676 to $927.27 and of a BCLP junior attorney ranging from $441 to $518.28 are nonetheless higher than required by the issues at stake especially in light of the existence of other cases in which the same or similar issues were adjudicated. Even though BCLP attorneys charged discounted rates to CNS, their rates remained excessive. Some BCLP attorneys, as Defendants point out, did not have prior experience in CNS First Amendment right to access litigation, including attorneys Glenn Coleman, Michael Neville, and arguably Jonathan Ginsberg,[6] and many more attorneys than necessary participated in this case.

Defendants further contend that BCLP's hourly rates are excessive because this case resulted in billing for "2624.9 hours of national and 98 hours of local counsel time[,]" when BCLP could have more efficiently used local counsel by "tell[ing] them what they need to know, giv[ing] them templates, hav[ing] them [] do most of the work at much lower costs, and edit[ing] their work as needed." (Doc. 99 at 3, 14.) Defendants base their argument on *Courthouse News Serv. v. O'Shaughnessy*, 2023 WL 7626992, at *5 (S.D. Ohio Nov. 15, 2023), wherein CNS requested attorney's fees for "43.2 hours of national and 634.8 hours of local counsel time[.]" (Doc. 99 at 3.) Due to differences in Ohio's court filing system and resolution of the case through mediation, CNS contends that "[i]t simply was not feasible — nor would it have been efficient — for BCLP to have staffed this case with only 'one BCLP partner with prior CNS experience, given its

---

[6] CNS contends that Jonathan Ginsberg had prior CNS litigation experience in *Courthouse News Service v. Tingling*, Case No. 1:16-cv-8742 (S.D.N.Y.) and *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-391 (E.D. Va.). As Defendants point out, however, "the lengthy fee declaration Courthouse News submitted in *Schaefer* does not mention [Jonathan] Ginsberg[, a]nd the docket sheet and [preliminary injunction] transcript in *Tingling* identify [William] Hibsher and two other associates as counsel for [CNS], not [Jonathan] Ginsberg." (Doc. 99 at 15 n.3) (internal citations omitted).

20

excellent local counsel templates from prior cases, and had them do almost all of the work.'" (Doc. 100-1 at 8, ¶ 14) (alteration adopted) (citations omitted).

In light of the Second Circuit's admonition that courts should not constrain themselves to in-district rates but should instead incentivize retention of experienced out-of-district counsel, the court finds that an hourly rate of $600 for each BCLP partner and an hourly rate of $400 for each BCLP associate to be reasonable.

The hourly rates of BCLP's two paralegals, ranging from $342 to $412, are equivalent to the rates experienced attorneys charge in the District of Vermont. In *Porter v. Dartmouth-Hitchcock Medical Center*, the plaintiff sought to recover fees for the work of paralegals with hourly rates ranging from $50 to $155, but this court found that "paralegal hourly rates of over $90 are not reasonable in this case." 2025 WL 3295806, at *12 (D. Vt. Nov. 26, 2025). The court explained that it had received "no information regarding the professional experience of any of the paralegals who billed for work in this case" and no "caselaw supporting the hourly paralegal rates in this case" and, therefore, "set[] a uniform rate, relying on its own familiarity with hourly paralegal rates prevailing in this [d]istrict, reduced slightly to account for the absence of information about each individual paralegal who billed in this case." *Id.* at *12 n.15.

CNS similarly provides no information regarding the experience of either paralegal who billed hours in this case. *See, e.g., Lee v. Mani & Pedi Inc.*, 2022 WL 3645118, at *6 (S.D.N.Y. Aug. 24, 2022) ("Where . . . 'the moving party fails to provide information on . . . paralegals' backgrounds and experience, courts have used their discretion to award fees at a rate lower than requested.'") (citations omitted). Based on the prevailing paralegal rates in this district, the court sets the hourly rate for the BCLP paralegals at $135. *See, e.g., Ha v. Conn*, 2023 WL 5287214, at *2 (D. Vt. Aug. 17, 2023) (finding an hourly rate of $125 to be reasonable for paralegals); *Sullivan*, 2021 WL 1851404, at *3 (finding an in-district hourly rate of $110 to be reasonable for paralegals and an out-of-district hourly rate of $125 to be reasonable for paralegals).

As for the hourly rates of local counsel at G&S, although the two senior attorneys, Robert Hemley and Matthew Byrne, have approximately fifty and twenty-five years of

21

experience respectively, as well as backgrounds in First Amendment newsroom and access to court issues, they described their roles as "liaison[s] with the local media plaintiffs," in which they "participate[d] in conferences with adverse counsel, advise[d] on local practice, and review[ed] and revise[d] pleadings." (Doc. 67-7 at 3, ¶ 6; Doc. 98-7 at 2-3, ¶ 5.) In light of their limited involvement, the court finds an hourly rate of $300 for the G&S attorneys to be reasonable. *See Porter*, 2025 WL 3295806, at *11-12 (finding that "attorney hourly rates of over $350 . . . are not reasonable in this case[]" even though "this case was fairly complex, raising federal claims and claims under Vermont and New Hampshire law[]"); *Concepts NREC, LLC v. Qiu*, 2025 WL 2793049, at *3 (D. Vt. July 21, 2025) ("[T]his [c]ourt has deemed a $300 hourly rate reasonable for an experienced attorney in a standard case[.]"), *report and recommendation adopted as modified*, 2025 WL 3012209 (D. Vt. Oct. 28, 2025); *Degreenia-Harris v. Life Ins. Co. of N. Am.*, 2021 WL 5979683, at *10 (D. Vt. Dec. 17, 2021) (acknowledging that rates between $350 and $450 "are on the high end of what the Vermont market will bear and are reserved for cases with complex issues[]").

## 2.    Reasonable Number of Hours.

To determine whether the number of hours spent on a matter was reasonable, the court examines the party's contemporaneous time records. These records must "specify, for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). The relevant question is "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). "Hours that are excessive, redundant, or otherwise unnecessary are to be excluded; and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application[.]" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (internal quotation marks and citations omitted). "[The Second Circuit] do[es] not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items[,]" *Lunday v. City of Albany*, 42 F.3d 131,

22

134 (2d Cir. 1994), especially where, as here, the movants submit a large volume of billing records. *See Porter*, 2025 WL 3295806, at *13.

CNS requests attorney's fees for the following hours per timekeeper, totaling approximately 2,519.20:

| Timekeeper | Total Hours[7] |
| --- | --- |
| William Hibsher | 378.10 |
| Jonathan Ginsberg | 858.20 |
| Roger Myers | 236.50 |
| Rachel Matteo-Boehm | 190.80 |
| Jonathan Fetterly | 153.70 |
| Glenn Coleman | 288.80 |
| Katherine Keating | 15.30 |
| Michael Neville | 173.90 |
| Eileen Weiss | 185.30 |
| Diana Myers | 2.50 |
| Robert Hemley | 65.10 |
| Matthew Byrne | 31.00 |

As a threshold issue, CNS failed to provide the court with summaries of each timekeeper's cumulative hours even though it provided general charts based on the total amounts billed supported by hundreds of pages of individualized billing entries. A court should not have to comb through this voluminous material to derive timekeeper totals. As a result, CNS must bear the burden of any imprecision.

"[A] reduction in a fee award is appropriate where overstaffing of a case results 'in needless duplication of work and retention of unnecessary personnel.'" *New York State Rifle & Pistol Ass'n, Inc. v. Nigrelli*, 2023 WL 6200195, at *15 (N.D.N.Y. Sept. 22, 2023) (citations omitted). "'[P]artner-heavy staffing' is a factor courts have held 'warrants a reduction in the hours awarded.'" *JTH Tax LLC v. Kukla*, 2025 WL 3014380, at *4 (E.D.N.Y. Oct. 28, 2025) (citation omitted).

---

[7] It is unclear whether CNS included the individual hours that each timekeeper dedicated to its initial motion for attorney's fees in its list of each timekeeper's hours in the present motion for attorney's fees. In the event that it did, to avoid double counting, the court calculated these total hours by adding each timekeeper's hours in Table 1 of the initial fee motion, *see* Doc. 67-1 at 18-19, and each timekeeper's hours as set out in Jonathan Fetterly's declaration. *See* Doc. 98-2 at 11-13, ¶¶ 21-30.

The court agrees with Defendants that this case, albeit important, did not require the services of ten attorneys and two paralegals, especially as CNS has litigated similar cases elsewhere. According to Defendants and unrebutted by Plaintiffs, CNS filed ten similar cases in 2021 and twenty-nine since *Schaefer*. *See* Doc. 99 at 10. While many BCLP senior attorneys worked on the case, Jonathan Ginsberg and Michael Neville, who were both associates at the time, performed the vast majority of the trial-level work, accounting for approximately 853.90 hours of the 1,343.60 total attorney hours that BCLP expended prior to the initial fee motion and appeal. Despite his associate title, Jonathan Ginsberg was billed at a partner rate of $707 presumably because he was promoted to partner during the pendency of the litigation.[8]

Defendants cite *O'Shaughnessy* for the proposition that BCLP's billed hours for trial-level work are excessive. There, the court "found 678.1 trial court hours excessive, far fewer hours than the 1,788.1 trial court hours CNS now seeks, and reduced the fees sought by approximately 45%." (Doc. 99 at 9-10) (citation omitted). CNS, by its own admission, has been represented by BCLP in similar First Amendment right to access cases "for nearly [twenty] years." (Doc. 98-1 at 14.) Despite any differences in procedural postures in this case and *O'Shaughnessy*, given their extensive experience in these cases, BCLP attorneys should be efficient in their drafting process. BCLP attorneys spent approximately 113.10 hours drafting the initial nineteen-page Complaint in this case. Courts have found spending over one hundred hours drafting even a lengthy complaint to be excessive.[9] In light of BCLP's prior experience drafting complaints for similar CNS right to access cases, the hours spent drafting the Complaint must be halved.

---

[8] CNS does not specify when Jonathan Ginsberg became partner, but the first billing entry listing him as a partner is dated January 25, 2022. The court retains his reported billing rate and includes it in its overall reduction of hours.

[9] *See, e.g., Safranek v. Wormuth*, 2024 WL 5186599, at *6 (S.D.N.Y. Dec. 19, 2024) ("The [c]ourt agrees that the nearly [eighty] hours spent drafting a [twenty-three]-page complaint is excessive.") (citations omitted); *New York State Rifle & Pistol Ass'n, Inc. v. Nigrelli*, 2023 WL 6200195, at *16 (N.D.N.Y. Sept. 22, 2023) ("[S]pending over 100 hours is clearly excessive for a relatively straightforward complaint and an opposition to [d]efendants' motion to dismiss[.]"); *Shim v. Millennium Grp.*, 2010 WL 2772493, at *5 (E.D.N.Y. June 21, 2010) ("To devote 100

In conjunction with the appeal to the Second Circuit, BCLP attorneys billed 919.20 hours, most of which were billed by senior attorneys. The appeal involved one constitutional issue and was duplicative of the work before this court. *See, e.g., Nigrelli*, 2023 WL 6200195, at *16 ("[The law firm]'s work on briefing for the Second Circuit is similarly excessive, especially given the similarities between the opposition submitted to this [c]ourt and the brief submitted to the Second Circuit and the inevitable outcome of the appeal at the Second Circuit."). Moreover, BCLP attorneys Glenn Coleman and Roger Myers, who had not been involved in the case previously, were primary counsel for the appeal. This likely led to time incurred in "getting up to speed" on a case with which their fellow attorneys were familiar. *See ACE Ltd. v. CIGNA Corp.*, 2001 WL 1286247, at *3 (S.D.N.Y. Oct. 22, 2001) ("[M]ore lawyers leads to more 'conference' time as well as to a certain amount of repetition or 'learning curve' billing which should not be compensable.") (citation omitted). As a result, the court finds 919.20 hours billed in connection with the appeal to be excessive and reduces the appeal-related hours to 203.30. *See Maldonado v. Houstoun*, 256 F.3d 181, 185-86 (3d Cir. 2001) (reducing 550 hours billed for work on an appeal to 212 hours because "this appeal could have been briefed and argued by a single lawyer or two[,]" "much if not all of the pertinent law had been briefed and argued in the [d]istrict [c]ourt[,]" and "the researching and briefing of the law on the single uncomplicated issue before this court did not require creating or developing an original theory or analyzing obscure principles of law[]"); *Osterweil v. Bartlett*, 92 F. Supp. 3d 14, 32-33 (N.D.N.Y. 2015) (reducing hours billed for work on an appeal to approximately 177.42 hours because there were "duplication of efforts by multiple attorneys on many of the tasks performed in this appeal[]" and "the time expended is unreasonable and includes redundant work[]"). To reflect this reduction, the court will exclude the 288.80 and 223.80 respective hours which Glenn Coleman and

---

hours and the combined efforts of three different attorneys to the formulation of a rather routine complaint is an inefficient, unreasonable amount of time to bill for a task of that nature."), *report and recommendation adopted*, 2010 WL 2772342 (E.D.N.Y. July 12, 2010).

25

Roger Myers billed with respect to the appeal from the fee calculation and halve the remaining five attorneys' hours billed in connection with the appeal.

With respect to CNS's initial motion for attorney's fees in this court, its motion for attorney's fees in the Second Circuit, and its instant motion for attorney's fees, CNS seeks attorney's fees for approximately 460.10 hours. Although "attorney['s] fees for the preparation of the fee application are compensable," *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir.1996), a "request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. BCLP attorneys spent at least 155.80 hours on CNS's instant fee motion and its reply, which is excessive considering that their briefs totaled thirty-two pages, CNS's instant motion to some extent mirrors its initial fee application, and CNS failed to submit fulsome summaries and charts representing the attorney's fees sought.[10]

BCLP attorney Jonathan Fetterly worked on this case after the Second Circuit's remand, in part to help with this motion "due to [his] specialized knowledge, skill, and experience in these kinds of challenges[,]" (Doc. 98-11 at 8, ¶ 15); however, this appears to have increased, rather than reduced, the time incurred. *See Samms v. Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) ("The [c]ourt also concludes that the 41.9 hours spent on the fee application was excessive. . . . Counsel has . . . had extensive experience filing similar applications but does not provide an adequate explanation of why so much time was needed in this particular case.").

---

[10] *See Francois v. Victory Auto Grp. LLC*, 2025 WL 2699991, at *7 (S.D.N.Y. Sept. 23, 2025) ("[T]he nearly 130 hours billed for work on the fee application is grossly excessive, even taking into account counsel's discretionary billing reductions.") (citation omitted); *China AI Cap. Ltd. v. DLA Piper LLP (US)*, 2025 WL 2466633, at *8 (S.D.N.Y. May 22, 2025) ("[T]wo experienced attorneys billed over 143 hours of time to a fee application that concerned one straightforward issue: whether the hourly rates of the timekeepers and the hours billed for the work performed were reasonable. Courts typically find that fee applications should not exceed [thirty] hours.") (collecting cases), *report and recommendation adopted*, 2025 WL 3204368 (S.D.N.Y. Nov. 17, 2025); *Magalios v. Peralta*, 2024 WL 1856303, at *9 (S.D.N.Y. Apr. 26, 2024) ("The [c]ourt finds that the 53.98 hours spent on the fee application are excessive, and thus warrant a reduction to 35 hours.").

26

Moreover, although "expenses relating to travel, including transportation and meals, are routinely recoverable[,]" *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 274, 287 (E.D.N.Y. 2008) (collecting cases), courts in the Second Circuit "typically approve compensation for travel time at half the timekeeper's ordinary hourly rate." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2025 WL 3012879, at *4 (S.D.N.Y. Oct. 28, 2025) (citation omitted); *see also Hemant Patel, M.D., P.C. v. Bandikatla*, 2024 WL 1509238, at *13 (S.D.N.Y. Apr. 5, 2024) ("[T]he custom in this Circuit is to reduce billing rates for travel by 50%.") (internal quotation marks and citation omitted), *aff'd*, 2025 WL 3264679 (2d Cir. Nov. 24, 2025). CNS attorneys billed their standard billing rates for travel time, and thus those hours must also be reduced. *See Cole v. Foxmar, Inc.*, 2024 WL 4609023, at *4 (D. Vt. Oct. 29, 2024) ("The court concludes that a 50% reduction of his rate for the time spent on travel is appropriate.") (citations omitted), *aff'd in part, vacated in part on other grounds*, 160 F.4th 28 (2d Cir. 2025).

Because the court finds that certain of CNS's requested hours "are excessive, redundant, or otherwise unnecessary," *Kirsch*, 148 F.3d at 173 (internal quotation marks and citations omitted), it has reduced those hours by 50%. *See, e.g., Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, 2013 WL 3322249, at *8 (S.D.N.Y. July 2, 2013) (applying 75% reduction because of "numerous hours" that were "either excessive or otherwise unreasonable" and collecting cases applying 50% to 75% reductions), *aff'd*, 679 F. App'x 33 (2d Cir. 2017). The reasonable hourly rates and reasonable number of hours result in a presumptively reasonable fee of $544,511.50 as follows:

| | Position | Hours Request | Rate Request | Reasonable Hours | Reasonable Rate | Lodestar |
|---|---|---|---|---|---|---|
| William Hibsher | Senior Counsel | 378.10 | $837.00-$905.00 | 189.05 | $600.00 | $113,430.00 |
| Jonathan Ginsberg | Partner | 858.20 | $707.00-$824.00 | 429.10 | $600.00 | $257,460.00 |
| Roger Myers | Partner | 236.50 | $743.00-$864.00 | 6.35 | $600.00 | $3,810.00 |
| Rachel Matteo-Boehm | Partner | 190.80 | $676.00-$786.00 | 95.40 | $600.00 | $57,240.00 |
| Jonathan Fetterly | Partner | 153.70 | $778.00 | 76.85 | $600.00 | $46,110.00 |
| Glenn Coleman | Partner | 288.80 | $878.00-$927.00 | 0 | $600.00 | $0 |
| Katherine Keating | Partner | 15.30 | $666.00-$731.00 | 7.65 | $600.00 | $4,590.00 |
| Michael Neville | Associate | 173.90 | $441.00-$518.00 | 86.95 | $400.00 | $34,780.00 |
| Eileen Weiss | Paralegal | 185.30 | $356.00-$412.00 | 92.65 | $135.00 | $12,507.75 |
| Diana Myers | Paralegal | 2.50 | $342.00 | 1.25 | $135.00 | $168.75 |
| Robert Hemley | Of Counsel | 65.10 | $510.00 | 32.55 | $300.00 | $9,765.00 |
| Matthew Byrne | Shareholder | 31.00 | $525.00 | 15.50 | $300.00 | $4,650.00 |
| Total | | | | | | $544,511.50 |

With the additional 40% across-the-board reduction applied to the presumptively reasonable fee due to Plaintiffs' degree of success on the merits, the court hereby awards CNS attorney's fees in the amount of $326,706.90.

## B.    Costs and Expenses.

CNS seeks to recover expenses and costs in an amount of $59,145.58, $47,025.00 of which are expert witness expenses and $12,120.58 of which are non-expert witness expenses "related to travel, shipping and courier expenses, document scanning and reproduction, and other litigation support[.]" (Doc. 98-1 at 18.) In the Second Circuit, "attorney's fees awards include those reasonable out-of-pocket expenses incurred by

attorneys and ordinarily charged to their clients." *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989). These expenses must be "incidental and necessary" to the representation. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987). Recoverable expenses under 42 U.S.C. § 1988 include expert witness fees, *see* 42 U.S.C. § 1988(c), and "[i]dentifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs[.]" *Kuzma v. I.R.S.*, 821 F.2d 930, 933 (2d Cir. 1987).

Defendants do not object to CNS's requested expenses and costs related to its expert witness. The court finds the expert witness expenses reasonable and, therefore, awards CNS $47,025.00. Defendants also do not oppose CNS's requested expenses related to travel expenses, courier costs, court costs, and other general litigation costs, which total $12,120.58. The court finds such expenses reasonable and awards CNS $12,120.58 in travel and litigation-related expenses.

For those reasons, the court awards CNS its requested expenses and costs, totaling $59,145.58.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART CNS's motion for attorney's fees. (Doc. 98.) Judgment shall be entered for CNS in the amount of $326,706.90 for attorney's fees and $59,145.58 for expenses and costs, for a total final judgment of $385,852.48.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 11th day of June, 2026.

Christina Reiss, Chief Judge
United States District Court

29